IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONI L. BUCKLER, | : | CIVIL ACTION NO. **1:CV-07-1414** |
| Plaintiff | : | (Judge Conner) |
| v. | : | (Magistrate Judge Blewitt) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

This is a Social Security disability case pursuant to 42 U.S.C. § 405(g), wherein the Plaintiff, Toni L. Buckler, is seeking review of the decision of the Commissioner of Social Security, ("Commissioner"), that denied her claim for Disability Insurance Benefits, ("DIB"), pursuant to Title II of the Social Security Act, ("Act").  42 U.S.C. §§ 401-433.

**I.      PROCEDURAL HISTORY.**

Plaintiff protectively filed an application for DIB on December 27, 2004, alleging disability since December 23, 2000, due to bipolar disorder, depression, arthritis and asthma.  (R. 13, 71, 120).  The state agency denied her claim initially and she filed a timely request for a hearing.  (R. 37-40).  A hearing was held before an Administrative Law Judge, ("ALJ"), on August 8, 2006.  (R. 292-347).  At the hearing, Plaintiff, represented by counsel, a vocational expert, ("VE"), and a medical expert, ("ME"), testified.  (R. 292-347).  Plaintiff was denied benefits pursuant to the ALJ's decision of September 28, 2006.  (R. 10-18).

Plaintiff requested review of the ALJ's decision.  (R. 8-9).  The Appeals Council denied her request on June 8, 2007, thereby making the ALJ's decision the final decision of the Commissioner.  (R. 3-5).  42 U.S.C. § 405(g).

The relevant time period of this case is December 23, 2000 (onset date), through September 30, 2002 (date last insured, "DLI").  *See* 20 C.F.R. §§ 404.130, 404.131.  In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions.  (Docs. 7, 8 and 9).

**II.     STANDARD OF REVIEW.**

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999). It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

### III.   DISABILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. *See* 20 C.F.R. § 404.1520.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether

the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  *See* 20 C.F.R. § 404.1520.

In the present matter, the ALJ proceeded through each step of the sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Act.  (R. 13-18).  At step one, the ALJ found that Plaintiff has not engaged in substantial gainful work activity since her alleged disability onset date, December 23, 2000.  (R. 15).  At step two, the ALJ concluded that, as of Plaintiff's date last insured of September 30, 2002, Plaintiff's bipolar disorder, marijuana use disorder, history of asthma and fracture of the fifth metatarsal were "severe" impairments within the meaning of the Regulations.  (R. 15).  At step three, the ALJ found that Plaintiff does not have an impairment, or combination or impairments, severe enough to meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.  (R. 15-16).

At step four, the ALJ found that Plaintiff is unable to perform any of her past relevant work.  (R. 17).  At step five the ALJ found that, through her date last insured, Plaintiff had the residual functional capacity, ("RFC"), to perform a limited range of light duty work.  (R. 16-17).  Thus, the ALJ determined that Plaintiff has not been under a disability, as defined in the Act, from December 23, 2000, through her date last insured, September 30, 2002.  (R. 18).

## IV.   BACKGROUND.

### *A. Factual Background.*

Plaintiff was born on April 14, 1960 and was forty-two (42) years old on her date last insured.  (R. 65, 71).  Therefore, she is considered a "younger person" under the Regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).

Plaintiff obtained her Graduate Equivalency Diploma, ("GED"), and has past work experience as a bank teller, cashier, deliverer, cafeteria attendant and fast food worker.  (R. 112, 121, 124, 341-42).

Plaintiff testified that she previously assaulted her husband and children and tried to

kill them several times. (R. 326). She stated that her husband has scars on his face from when she hit him with a champagne bottle. (R. 326).

Plaintiff took various medications to treat her mental impairments. (R. 317). Before she started taking Lithium, she was always suicidal. (R. 336). Since taking Lithium, Plaintiff has not had suicidal thoughts. (R. 336).

Plaintiff stated that she had problems with concentration, was easily distractable, hyperactive, slept only two to three hours per night and sometimes stayed awake for three days with no sleep. (R. 336). During the relevant time period, Plaintiff shopped, did laundry and occasionally cleaned. (R. 337-38). Plaintiff testified that she felt embarrassed or ashamed when out in public. (R. 337-38). She had no friends and did not go out socially. (R. 338-40).

Medical expert, Robert Brown, Jr., M.D., testified at the ALJ hearing. (R. 295-325). Dr. Brown stated that Plaintiff alleged low back pain, neck pain, many mental conditions, possible bipolar disorder and a history of substance abuse. (R. 296). He stated that the results of Plaintiff's Minnesota Multiphasic Personality Inventory, ("MMPI") test reveal "a great deal of exaggeration of mental health claims." (R. 296).

Vocational expert, Marvin Kester, testified based on the *Dictionary of Occupational Titles*. (R. 341-47). In response to the ALJ's hypothetical questions, the VE testified that Plaintiff would be capable of performing work as a small products assembler, a packing line worker and an egg candler. (R. 343-44). The VE also stated that, due to Plaintiff's asthma, she would be restricted to an environment with not a lot of dust or fumes and very minimal public contact. (R. 345). The VE then testified that an individual with Plaintiff's same background with thoughts of suicide, homicide and a plan to kill a particular individual, who was very distraught, tearful and agitated, would not be able to perform any work. (R. 346-47).

On Plaintiff's February 1, 2005 disability questionnaire, she reported that she took care of her husband, cooked, did laundry and grocery shopped. (R. 80-81). Plaintiff stated that she did no yard work and rarely did housework. She reported that she had to rest while

taking care of her personal needs. (R. 81-83). She has difficulty getting along with others and does not get along with people in authority. (R. 84).

### B. Medical Background.

Plaintiff began treating with Leo Kratz, D.O., in 1996. (R. 161-229). On November 13, 2000, Plaintiff reported to Dr. Kratz that she had a very strong desire to kill her daughter's boyfriend because she believed he raped her daughter. (R. 135, 139, 180). Plaintiff was sent for crisis intervention and she voluntarily admitted herself to the hospital. (R. 135-55). While hospitalized, Plaintiff was treated by E.A. English, M.D., and J.F. Druckenbrod, M.D. Plaintiff reported that she previously assaulted her daughter's boyfriend and had harassments charges filed against her. (R. 135). Plaintiff reported that she abused marijuana and previously abused alcohol and prescription pills. (R. 136). She also reported recurrent depression.

Dr. Druckenbrod performed a psychiatric evaluation and diagnosed bipolar I disorder with a most recent episode of depression, marijuana abuse and hypothyroidism. (R. 135). Upon mental status examination, Plaintiff was cooperative, fully oriented and she scored a 30 out of 30 on the Mini-Mental State Exam, indicating that she is in the "normal" range.[1] (R. 136). Plaintiff had death wishes but no suicidal thoughts, she had homicidal thoughts and intention, but no hallucinations, delusions or depersonalizations. (R. 136). She reported that she wanted help to lessen her homicidal thoughts.

Plaintiff continued to treat with Dr. Kratz through 2005. (R. 161-229).

Plaintiff underwent a clinical psychological disability evaluation with Mary Languirand, Ph.D., on March 9, 2005. (R. 230-36). Dr. Languirand diagnosed bipolar I disorder, hypomanic, severe, without inter-episode recovery, marijuana abuse (in partial full

---

[1] The Mini-Mental State Exam is "a brief, quantitative measure of cognitive status in adults. It can be used to screen for cognitive impairment, to estimate the severity of cognitive impairment at a given point in time, to follow the course of cognitive changes in an individual over time, and to document an individual's response to treatment." *See Mini-Mental State Exam* at http://www.minimental.com/

remission), arthritis, high cholesterol, catastrophic stress and assessed a Global Assessment of Functioning, ("GAF"), score of 25.[2]  (R. 232).

On March 22, 2005, Louis D. Poloni, Ph.D., a Disability Determination Services ("DDS") physician, completed a Psychiatric Review Technique Form and evaluated Plaintiff's impairments pursuant to Listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders).  (R. 237).  Dr. Poloni found that Plaintiff suffers from depressive disorder, NOS, and marijuana abuse in full early remission.  (R. 240, 245).  Pursuant to the "B" criteria of the Listings, Dr. Poloni found that Plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, marked difficulties in maintaining social functioning and no repeated episodes of decompensation.  (R. 247).  Dr. Poloni then found that Plaintiff met Listing 12.04(C)(2).  (R. 249).

Dr. Poloni also found that there was insufficient evidence to determine Plaintiff's condition as of September 30, 2002.  (R. 251).

On May 2, 2006, Plaintiff underwent a clinical psychological evaluation with Joseph Levenstein, Ph.D.  (R. 268-73).  Dr. Levenstein diagnosed bipolar disorder I, NOS, arthritis, asthma, migraines, hyperlipidemia, tinnitus, homelessness and assessed a GAF score of 45,[3] and he noted that Plaintiff's highest GAF score in the previous year was 45.  (R. 273).

Dr. Levenstein administered the MMPI test and stated that the results revealed

---

[2]  A GAF score between 21 and 30 provides that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR").

[3]  A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

"serious validity problems." (R. 268-73). The results of the F[4] and Fb[5] scales revealed a strong tendency to magnify symptoms. (R. 272). The VRIN[6] and TRIN[7] scales indicated that Plaintiff understood the test. (R. 272). The test indicated a sad individual that ruminated over her complaints. Plaintiff had limited insight, she experienced internal conflict as physical symptoms, she had a sense of being defeated by life and was very alienated from others. Plaintiff blamed others for her problems, withdrew into schizoid fantasies and there was a possibility of hallucinations. (R. 272). Dr. Levenstein noted that the MMPI results were consistent with a depressive phase to Plaintiff's bipolar disorder. He stated that Plaintiff was demoralized, pessimistic, withdrawn from others, there were indications of past manias and a history of antisocial behavior, difficulty conforming to social norms and poor achievement. (R. 272).

Overall, Dr. Levenstein concluded that Plaintiff could perform her activities of daily living on an independent basis, she could maintain a household routine independently, but it was unlikely that she could complete most work activities. She had difficulty sustaining her behavior, her social behavior could be appropriate, however there would be periods of aggressiveness or social withdrawal, causing significant problems in family and occupational

---

[4] The F scale is used to detect attempts at "faking good" or "faking bad." People who score high on this test are trying to appear better or worse than they really are. This scale asks questions designed to determine if test-takers are contradicting themselves in their responses. *See About.com: Psychology* at http://psychology.about.com/od/psychologicaltesting/a/mmpi_3.htm

[5] The Fb scale is composed of 40 items that less than 10% of normal respondents support. High scores on this scale sometimes indicate that the respondent stopped paying attention and began answering questions randomly. *Id.*

[6] The Variable Response Inconsistency ("VRIN") scale is a method to detect inconsistent responses. *Id.*

[7] The True Response Inconsistency ("TRIN") scale was developed to detect patients who respond inconsistently. It consists of 23 paired questions that are opposite of each other. *Id.*

situations.  (R. 272).

On May 11, 2006, Dr. Levenstein completed a Medical Source Statement of Plaintiff's Ability to do Work-Related Activities (Mental).  (R. 274-76).  Dr. Levenstein found that Plaintiff had no limitations in the ability to understand, remember and carry out short, simple instructions.  Plaintiff had slight limitations in the ability to understand, remember and carry out detailed instructions.  Plaintiff had moderate limitations in the ability to make judgments on simple work-related decisions, interact appropriately with the public, supervisors and co-workers, and respond appropriately to changes in a routine work setting.  (R. 275).

**V.    DISCUSSION.**

***A.  Whether the ALJ failed to comply with SSR 83-20 to determine Plaintiff's onset date.***

Plaintiff argues that the ALJ failed to ask any of the treating or examining medical sources for an opinion regarding Plaintiff's onset date.  (Doc. 7 at 8).  Plaintiff notes that neither of the consultative psychologists addressed the onset date.  As noted, Dr. Poloni found that there was insufficient evidence to determine Plaintiff's condition as of September 30, 2002.  (R. 251).  Thus, Plaintiff states that the Agency had a duty to obtain evidence from lay sources to address when Plaintiff's mental illness first disabled her.  (Doc. 7 at 8).  When the SSA failed to do so, Plaintiff states that the ALJ then had the responsibility to obtain such evidence.  Further, Plaintiff states that her attorney did not have adequate opportunity to question her or the medical expert, Dr. Brown.  (Doc. 7 at 9).

Defendant states that the medical evidence does not establish that Plaintiff was disabled through her DLI and that Plaintiff's attorney had ample opportunity to question Plaintiff and Dr. Brown.  (Doc. 8 at 12).  Defendant also states that although Plaintiff argues that the ALJ did not obtain records of her most recent mental health treatment, she cannot be found disabled unless her insured status is also met at the time when the evidence establishes the presence of a disabling condition.  (Doc. 8 at 11-12).  Defendant notes that the Agency sustained its duty to develop the lay evidence by asking Plaintiff's husband to

complete a Disability Function Report. (Doc. 8 at 12). Further, Defendant notes that Plaintiff never asked the ALJ to keep the record open so she may submit additional evidence.

The ALJ determined that Plaintiff met the insured status requirement of the Act through September 30, 2002. (R. 15). The ALJ found that there was little evidence supporting a finding of disabled prior to September 30, 2002. (R. 17).

Social Security Ruling, ("SSR"), 83-20 sets forth the policy, and describes the relevant evidence to be considered, when establishing the onset date of disability. SSR 83-20 defines the onset date of disability as "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20. When determining the onset date of disability, the ALJ should consider: (1) the claimant's allegations; (2) the claimant's work history; and (3) the medical and other evidence. SSR 83-20. Further, SSR 83-20 provides, in part:

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

SSR 83-20.

When "the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor." *Newell v. Commissioner of SSA*, 347 F.3d 541, 549 (3d Cir. 2003) (citing *DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991)). Here, the ALJ elicited testimony from a medical expert regarding Plaintiff's case. Dr. Brown testified that he reviewed Plaintiff's file on three occasions. (R. 309). He noted that Plaintiff alleged low back pain, neck pain, many mental conditions, possible bipolar disorder and a history of substance abuse. (R. 296). He also stated that the results of Plaintiff's MMPI test reveal that she exaggerated her mental health claims. (R. 296). However, Dr. Brown never addressed Plaintiff's onset date and the ALJ never asked Dr. Brown to address the onset date.

Additionally, Plaintiff states that the ALJ erred by not addressing the Disability

Function Report completed by Plaintiff's husband, Rickey Starr Buckler. On February 5, 2005, Mr. Buckler completed the report addressing Plaintiff's daily activities and abilities. (R. 104-111). Mr. Buckler reported that, during the day, Plaintiff takes care of him, does laundry, uses the computer, watches television and visits with her grandchildren. (R. 104-05, 108). He reported that Plaintiff can no longer work, she has trouble sleeping, she must be reminded to take care of her personal needs and requires help taking medication. (R. 105-06). Plaintiff cooks, but has trouble doing so, and does light cleaning. (R. 106). Mr. Buckler stated that Plaintiff only goes out once a month to grocery shop, she is able to pay bills and count change and she goes to church. (R. 107-08). He stated that Plaintiff is hard to get along with, she argues with others and does not get along with authority figures. (R. 109-110). She has trouble squatting, trouble with her memory and trouble completing tasks. (R. 109). He believed that Plaintiff could walk 100 to 500 feet before resting for ten to fifteen minutes, and she could pay attention for fifteen minutes at a time. (R. 109).

The ALJ failed to address Mr. Buckler's statements regarding Plaintiff's capabilities and activities of daily living. Without the ALJ's evaluation of Mr. Buckler's Disability Function Report, the court cannot determine what weight, if any, was accorded to this evidence. Further, the Agency failed to contact Plaintiff's children regarding Plaintiff's assault and attempts to kill them. Thus, we recommend remand for the ALJ to evaluate Plaintiff's onset date.

### B. Whether the ALJ erred by not determining which portion of Plaintiff's testimony was credible.

Plaintiff argues that the ALJ erred by not stating what portion of Plaintiff's testimony was credible. (Doc. 7 at 10). Defendant states that the ALJ properly determined that Plaintiff's subjective complaints were only partially credible to the extent that she was restricted to performing a wide-range of simple, light work that involved infrequent contact with the public. (Doc. 8 at 18).

When considering a claimant's subjective complaints of pain, an ALJ must engage in a two-step analysis. First, an ALJ must determine if the alleged disabling pain could reasonably

result from the medically determinable impairment; and second, the ALJ must consider the intensity and persistence of the claimant's disabling pain, and the extent to which it affects his ability to work. *See Diaz v. Commissioner of Social Security*, 39 Fed. App'x 713, 714 (3d Cir. June 12, 2002).

At the same time, "[a]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985). Where in fact "medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Mason*, 994 F.2d at 1067-68 (citing *Carter v. Railroad Retirement Bd.,* 834 F.2d 62, 65 (3d Cir. 1987)*; Ferguson,* 765 F.2d at 37).

The ALJ reviewed the medical records and the treating and examining physicians' notes. She also considered Plaintiff's testimony regarding her pain and daily activities and capabilities. The ALJ noted that the MMPI test results and Dr. Brown's testimony revealed that Plaintiff greatly exaggerated her responses on the test.

Based on the evidence presented and the testimony at the hearing, the ALJ found the Plaintiff not entirely credible. (R. 16). "'[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." *Frazier v. Apfel*, 2000 WL 288246 (E.D. Pa. March 7, 2000). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Com. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999). An ALJ may find testimony to be not credible, but he must give great weight to a claimant's subjective testimony. *Id*. Yet subjective complaints, without more, do not in themselves constitute a disability. *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984). Here, the Plaintiff's subjective complaints

11

were not borne out by her medical records.

The ALJ pointed to both medical evidence and evidence of Plaintiff's activities of daily living which contradicted Plaintiff's claims of total disability. (R. 16-17). The ALJ concluded that the medical record did not substantiate the extent of Plaintiff's subjective complaints. (R. 16). The ALJ noted that the record reveals almost no treatment history through her date last insured, other than the November 2000 evaluation. (R. 17). Despite Plaintiff's complaints of extreme limitations, the November 2000 report reveals that she was cooperative, fully oriented, denied hallucinations, delusions or depersonalizations and was able to show humor. (R. 16). The ALJ stated that although Plaintiff fractured her fifth metatarsal, there is no evidence that it was expected to last twelve months. (R. 16-17). The ALJ further noted that there is little medical or clinical evidence of record supporting a finding of disability prior to Plaintiff's DLI. (R. 17). The ALJ found that there is no evidence that Plaintiff's physical impairments met Listing 1.00 (Musculoskeletal System), noting that Plaintiff was able to ambulate effectively on a sustained basis. (R. 16). 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 1.00. The ALJ also found that Plaintiff did not meet Listing 3.00 (Respiratory System), noting that she required very little treatment for her asthma and rarely complained of respiratory problems. (R. 16). 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 3.00.

Further, in December 2000, Plaintiff was more stable, was not seeing a counselor and did not require ongoing care from her family physician other than medication refills. (R. 17).

The ALJ thus found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 15).

While the record reflects that Plaintiff suffers from limitations as a result of her impairments, there is evidence in the record to support the ALJ's finding that Plaintiff's subjective complaints were not entirely credible. However, upon remand, the ALJ should reevaluate Plaintiff's credibility.

### *C. Whether the ALJ erred by using Plaintiff's lack of treatment to deny benefits.*

Plaintiff argues that the ALJ erred by relying on her lack of treatment to deny her benefits. (Doc. 7 at 13-15). As stated, the ALJ noted there is almost no treatment history through her date last insured, other than her November 2000 evaluation. (R. 17).

Defendant states that Plaintiff made somewhat inconsistent claims as to why she did not seek regular mental health treatment during the relevant period. (Doc. 8 at 18-19). Plaintiff first stated that she had no money for treatment. However, she then stated that her husband made too much money to qualify for state hospitalization. (R. 326-27). Defendant states that Plaintiff failed to show that she did not have access to free or low-cost medical services. Further, if Plaintiff required hospitalization, she would have received treatment regardless of whether she had medical insurance. (R. 332-33).

Defendant notes that SSR 96-7p provides that, when determining Plaintiff's credibility, the Agency may consider the medical record demonstrating a claimant's attempts to seek medical treatment and to follow it. *See* SSR 96-7p. (Doc. 8 at 18).

Additionally, "SSR 96-7p states that 'the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.'" *Beasich v. Commissioner of Soc. Sec.*, 66 Fed. App'x 419, 429, note 5 (3d Cir. 2003) (quoting SSR 96-7p). At the hearing, Plaintiff testified regarding her lack of treatment. However, the ALJ did not address Plaintiff's explanations in her decision.

The Third Circuit has stated, "[t]he fact that a 'claimant may be one of the millions of people who did not seek treatment for a mental disorder until late in the day' is not a substantial basis to reject that an impairment existed." *Beasich*, 66 Fed. App'x at 429 (quoting *Van Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).

Plaintiff has presented evidence supporting her claim that the ALJ should not have used her lack of treatment as a reason to deny her benefits.

### ***D. Whether the ALJ erred by finding that Plaintiff failed to meet Listing 12.04.***

The Supreme Court has held that a claimant must prove that her condition meets every criteria in a listing before she can be considered disabled *per se*. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is disabled *per se* under Listing 12.04 when she either satisfies the requirements of both 12.04(A) and 12.04(B), or of 12.04(C).  The ALJ found that Plaintiff's impairment met diagnostic criteria of Listing 12.04(A), but did not meet the criteria of 12.04(B) or 12.04(C).  (R. 15).

To meet the requirements of "A" and "B", Plaintiff had to show "medically documented persistence, either continuous or intermittent, of one" of a number of enumerated "A" criteria symptoms, in addition to at least two of the following "B" criteria:

>   1. Marked restriction of activities of daily living; or
>   2. Marked difficulties in maintaining social functioning; or
>   3. Marked difficulties in maintaining concentration, persistence, or pace; or
>   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04(B).  Under Listing 12.04(B), the ALJ found there were mild restrictions of activities of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (R. 16).  20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04(B).

The ALJ then found that the evidence does not establish the presence of the "C" criteria of Listing 12.04.  (R. 16).  The ALJ noted there is no evidence that Plaintiff experienced repeated episodes of decompensation, each of an extended duration, or that Plaintiff had a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the Plaintiff to decompensate.  20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04(C)(1), (C)(2).  (R. 16).  The ALJ also noted that there is no evidence that Plaintiff had a current history of one or more years' inability to function outside a highly supportive living

arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04(C)(3). Plaintiff argues that the ALJ provides no rationale for how she analyzed the "B" and "C" criteria of Listing 12.04. (Doc. 7 at 16).

A review of the ALJ's decision reveals that she failed to state how Plaintiff did not meet Listing 12.04. As stated, on March 22, 2005, Dr. Poloni completed a Psychiatric Review Technique Form and found that Plaintiff met Listing 12.04(C)(2). (R. 249). Dr. Poloni found that Plaintiff suffers from depressive disorder, NOS, and marijuana abuse in full early remission. (R. 240, 245). Pursuant to the "B" criteria of the Listings, Dr. Poloni found that Plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, marked difficulties in maintaining social functioning and no repeated episodes of decompensation. (R. 247).

As stated, Dr. Languirand performed a psychological evaluation on March 9, 2005. (R. 230-36). Dr. Languirand diagnosed bipolar I disorder, hypomanic, severe, without inter-episode recovery, marijuana abuse, in partial full remission, arthritis, high cholesterol, catastrophic stress and assessed a GAF score of 25. (R. 232).

Dr. Languirand found that Plaintiff had slight restriction in the ability to understand and remember short, simple instructions. Plaintiff had slight to moderate restrictions in the ability to understand and remember detailed instructions and make judgments on simple work-related decisions. She had moderate limitations in the ability to carry out short, simple instructions and respond appropriately to changes in a routine work setting. Plaintiff had moderate to marked limitation in the ability to respond appropriately to work pressures in a usual work setting. She had marked limitations in the ability to carry out detailed instructions and interact appropriately with the public. Plaintiff had extreme limitations in the ability to interact appropriately with supervisors and co-workers. (R. 234).

There is a significant basis for a determination that the ALJ erred by failing to find that Plaintiff's condition met or equaled Listing 12.04.

### E. Whether the ALJ erred at Step Five of the sequential evaluation process.

Plaintiff's last argument is that the ALJ erred by not including all of Plaintiff's

impairments in the hypothetical questions and the RFC determination.  (Doc. 7 at 21-24). Defendant states that the ALJ properly based her hypothetical question on Dr. Brown's assessment of Plaintiff's RFC.  (Doc. 8 at 21).

The final and fifth step of the sequential evaluation process requires an analysis of whether Plaintiff, based on her age, experience, education, and residual functional capacity and limitations, can perform any other work in the national economy.  *See Plummer*, 186 F.3d at 428; *Burnett v. Comm. of SSA*, 220 F.3d 112, 126 (3d Cir. 2000).  Thus, at this step, the Commissioner must demonstrate that the Plaintiff is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f); *Plummer*, 186 F.3d at 428.  In making a disability determination, the ALJ must analyze the cumulative effect of all of the Plaintiff's impairments.  20 C.F.R. § 404.1523; *Plummer, supra*.  Based on the testimony of an impartial vocational expert, the ALJ concluded that, considering the Plaintiff's age, educational background, work experience, and RFC, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy. (R. 16-17).

A hypothetical question must include all of a claimant's impairments which are supported by the record; one which omits limitations is defective and the answer thereto cannot constitute substantial evidence to support denial of a claim.  *Ramirez v. Barnhart*, 372 F.3d 546, 553-55 (3d Cir. 2004); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987); *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).  However, "[w]e do not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant."  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original).

In the present matter, the ALJ asked the vocational expert to hypothetically consider an individual with the ability to perform sedentary or light work, with asthma-related restrictions and with some public contact.  (R. 343).  The vocational expert stated that such an individual would be able to perform work as a small products assembler, with over 3,400 jobs available in the region and over 470,000 jobs available in the nation; a packing line worker, with 7,900 jobs available in the region and over 465,000 jobs available in the

nation; and an egg candler, with 405 jobs available in the region and 124,000 jobs available in the nation.  (R. 343-44).

Plaintiff's attorney then asked the VE to consider an individual with Plaintiff's same age, education and work history with a history of being suicidal, homicidal and a plan to kill a particular individual.  The individual would also have a history of being very distraught, tearful and agitated.  The VE stated that such an individual would not be able to perform any work.  (R. 346-47).

The ALJ concluded that, through Plaintiff's date last insured, she had the RFC to frequently lift and carry ten pounds, occasionally lift and carry twenty pounds, sit for six hours in an eight-hour workday, stand and walk for six hours in an eight-hour workday, push and pull as much as she could lift and carry, should avoid detailed or complex work tasks, frequent contact with the public, perform simple tasks and must avoid exposure to temperature extremes, dust and fumes.  (R. 16).

Based upon the ALJ's finding on remand, the ALJ should determine whether Plaintiff is capable of performing other work in the economy.

**VI.    RECOMMENDATION.**

Based upon the foregoing, it is respectfully recommended that Plaintiff's appeal be **GRANTED** and the case be remanded for further proceedings consistent with this report.

                                    s/ Thomas M. Blewitt
                                    **THOMAS M. BLEWITT**
                                    **United States Magistrate Judge**

**Dated:  May 16, 2008**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONI L. BUCKLER, | : | CIVIL ACTION NO. **1:CV-07-1414** |
| Plaintiff | : | (Judge Conner) |
| v. | : | (Magistrate Judge Blewitt) |
| MICHAEL J. ASTRUE,<br>Commissioner of<br>Social Security, | : | |
| Defendant | : | |

**NOTICE**

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **May 16, 2008.**

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within ten (10) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where

required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

                                        **s/ Thomas M. Blewitt**
                                        **THOMAS M. BLEWITT**
                                        **United States Magistrate Judge**

**Dated: May 16, 2008**